Good morning, Your Honors. I'm Glenn Short. I represent Defendant Appellant Joseph Pajardo. We submitted our brief after the Blakely decision, but before the Booker decision, so I'm assuming or anticipating that the panel has some questions as to how we recast our arguments on appeal in light of the Booker decision. How are you going to split your time? We're going to split it in half. Alright. So do you want a remand under Ammaline? Is that what you're requesting? That's partly what we're asking, Judge. That would be for our argument or our issue as to the denial of the motion for a downward departure due to coercion. But we also, and I guess there would also be Ammaline remand issues as to our issue regarding the denial or, sorry, the imposition of the two-level entries on the guidelines for possessing a gun or two guns. In this case, we argued and we now argue that the guns were not possessed in connection with the drugs. The third issue is other U.S. v. Thomas, where at the change of plea or two change of plea hearings, it's our argument that the defendant did not give an explicit admission as to the drug amounts. The government in both change of pleas gave a long and factual recital as to the offense in question, possession offenses. And at the end of the recital, the sentencing judge or the judge taking the change of plea said, is there anything that you disagree with, Mr. Fajardo? And he said no. Does the quantity of drugs matter at this point? Yes, Your Honor. Why does it matter? The total quantity, according to the government's recital, was about three kilograms. Well, what I'm saying is that issue has to go back via an Ammaline remand because the determination, and I understand, even if the government is correct that your client conceded the amount, you have a nonconstitutional entitlement to go back because the court thought properly, understandably, that it was operating under a mandatory regime and it wasn't. So an Ammaline remand or the counterpart case for the nonconstitutional error, which is Moreno-Hernandez, I think, that's kind of in place already. And it seems to me drug quantity only speaks to that question. Now, some of your other issues with regard to the firearms, and I'm suddenly blanking on what the other one, oh, you made a request for you're arguing there not simply that the court made factual findings, but that applying the guidelines, which the court still has to do in an advisory regime, the guidelines were not properly applied. So it seems to me those issues might still be alive, but I don't understand what's still alive with regard to drug quantity. I mean, the government will get a chance to speak to it, but it seems to me a remand under Ammaline is sort of automatic at this point with regard to that part. If that is the position, then I have to speak a little bit louder. I'm sorry. If the if you're aware that there will be in your view a remand under Ammaline as to the drug amount, then we would agree that to your characterization as a being as it being not alive. We'll hear from the government a minute, but maybe you can tell us what other issues you think that your client has. I know that your co-defendant has conviction issues that are alive, so I just want to use the time as efficiently as we can. Yes, sure. As far as the imposition of the gun bump, the two-level increase, the judge at Senecin said explicitly on the record, the burden is on the defense to disprove the gun bump. And of course, that's clearly, clearly erroneous under the Ammaline decision. That was part of the facts in Ammaline where the judge at Senecin put the burden on the defendant. As far as the coercion issue, we did argue that the lead defendant, Tharaniko Ooty, coerced the defendant to keep acting in the conspiracy. The conspiracy started in October 2000 and ended with the arrest of the people involved in April 2001. In December 2000, Mr. Pahala told Ooty, I want to get out of this drug activity. Mr. Ooty said, well, before I had to break people's arms when they said things like that, I may have to do that to you. We submitted the synopsis of Mr. Pahala's debriefings to the judge where the evidence required this report of coercion. We submitted a letter from Mr. Pahala to myself where he talks about the threats. If all this goes back, it would be kind of odd for us to determine any of those issues, wouldn't it? I mean, if it just goes back for resentencing and everything's back on the table. I suppose we would accept that gladly. We would hope that this panel would see that there is sufficient evidence on our issue as to coercion to find that the coercion did occur. The judge, after hearing our presentation as to coercion, said, well, how can our statements from the defendant himself substantiate the coercion? However, specifically, that sort of evidence is not, per se, improper according to the guidelines of Section 6A1.3. It states, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial provided that the information has sufficient indicia of reliability. Reliability to support its probable accuracy. We, nevertheless, he gets arrested. He's being debriefed. He has no other option to, to fudge the facts. He's called in court. So he has these indicia of reliability, more so for the letters that he writes to his counsel and so forth. The judge also said, well, hey, you didn't mention any of this coercion stuff at the change of plea. Clearly, that's not the purpose of the change of plea. The purpose of the change of plea hearing is very confined. It is, it is establishing a factual basis and making sure that the defendant understands his various rights. He had no other option to bring up coercion at the change of plea, but those were the two reasons that the court advanced for denying the request for the Denver departure. All right. I think we have your issues in mind, and we'll hear from the government when it's their turn to just see what possible posture this case is in. Thank you. Thank you. May it please the court. My name is Stuart Fujioka. I'm appearing on behalf of defendant as a special education student in school. She eventually got a GED and was working as a loan clerk for the city. No, I hear your mother. Just look at us and speak up and tell us what the case is about. We know her background. She has a lot of issues. So I would suggest you get right to the legal issues. I guess perhaps the most troublesome is the initial suppression of her supposed statement to the agents and then the subsequent readmission into evidence at trial. I think the government and the appellant both rely on Oregon versus Haas in terms of whether a suppressed statement can come back into evidence. We're in the position that there is no file of voluntariness. At the suppression level, clearly the court was not able to determine whether the statement was voluntary and there was no instruction. Well, isn't the problem here, just to cut to the chase, if something was suppressed, but then you go and you testify contrary to that, then it can come in as impeachment evidence? If certain safeguards are followed. But you don't need those safeguards for impeachment purposes as opposed to substantive purposes. Isn't the problem here that there's no limiting instruction to the jury so they are not told  I think so. And I believe that's what Oregon versus Haas required. Not any finding of voluntariness, which was not clear on the record. In graphing the suppression in the first place, the judge was concerned about it. And apparently that was not addressed before the agent was allowed to testify. So, Don, we feel the court erred and that alone should be sufficient for a new trial. What was the error? Was it permitting the impeaching statement to come in? Was it proper to let it come in? But there should have been a limiting instruction. I'm not really sure I have a handle on what your position is. Admitting the statement without proper safeguards specified under Supreme Court case law, there is no finding of voluntariness of the statement. And once entered, there was another error in not instructing the jury about proper use of that particular testimony. I have a question to ask you. You raised the sufficiency of the evidence in your motion for a new trial, did you not? Yes. During the course of the trial, did you move for an acquittal? I did not try the case, but I believe a motion for judgment of acquittal was made. The next issue I would like to address is the impeachment of Joseph Pajardo, who was Vanessa's boyfriend. And he testified as a defense witness, initially saying that Ms. Barute had no involvement and no knowledge. Then on cross-examination, he said otherwise. Nonetheless, his initial statement, which was consistent with his testimony on direct examination, based on interviews by law enforcement, was not permitted into evidence. It was a statement adopted by him, consistent with his direct testimony, but inconsistent with his testimony on cross-examination. And clearly, that should have been presented to the jury. The judge had preemptively by motion in limine trial counsel, he would not be able to present that evidence. Let me just get that one straight because there's a lot of statements. That's the one where it was excluded because it was cumulative? Cumulative prior consistent statement. Right. So in other words, that statement was the same thing he was going to say on direct examination. And had already said on direct examination. So he says she didn't know. And then he gets then they have some government impeachment. So then what your argument is that, well, he should then be able to say or the counsel should be able to say, well, didn't you also say she didn't know when you first talked to the you know, when you were riding in the car and talking to the police. So you would want him to be able to actually buttress his trial testimony with his statement. Is that correct? Not only buttressing the direct examination testimony, but also contradicting his cross-examination testimony, which is completely unexpected. Why would it be unexpected when he had other inconsistent statements? Because he had the cross-examination was based upon a statement attributed to him in police reports, which, unlike the first statement, was not assigned, was not signed or otherwise adopted. So shock also was not expecting him to testify in that manner. So in other words, the second statement forward were just police reports. I believe so. OK. And then did they bring the policeman in to tie up the impeachment with respect to Pajaro's statement? I don't believe so. OK. And there was no limiting instruction on that one either. No, I don't believe so. And the other issues we raised were that Vanessa's husband was totally irrelevant to the issue, to whether she knew what she knew or when she knew it. I think we've touched on the threat of not being supported by the evidence. We also raised issues in the motion for new trial, whether or not Pajaro was a client of Baruch's attorney, and whether this was newly discovered evidence when Pajaro said that he committed perjury. We think it's different from testifying two different ways where the guy actually admits that he lied. That became newly discovered evidence and that should have supported a new trial and Pajaro had no privilege with Baruch's former attorney. We've briefed that. The sentencing issue obstruction enhancement, I couldn't find Ninth Circuit law, but other circuits remanded at least to ask the trial judge whether the sentence would have been the same had they known about Blakely and Booker and Fan Fan. I'm running out of time. All right. Make sure I know your position on sentencing. Do you request a remand to the district court to determine whether the sentence would have been the same? Some defendants have opted not to. I take it you are making that request. Yes, we'll make that request. Okay. Thank you. May it please the Court. Good morning. Tom Mielek for the United States. I was here yesterday with much better weather. But let me start, if I may, talking about the Baruch case since that seems to be many of the factual issues here. Raise the mic a little bit. Yes, sir. I'm sorry, Your Honor. Is that better now? Much better. Thank you. Yes, sir. The impeachment of Defendant Baruch, Vanessa Baruch, with her suppressed statement, suppressed based upon the court's finding that the government had not shared our preponderance of evidence that the Fifth Amendment waiver had gone into the post-polygraph portion of the interview. That's clear. Orville v. Haas says that's appropriate, it's permissible. The defense objects that there was no letter of instruction. There was no request for a letter of instruction. There was no objection at the time that was came in. There was a apparent inconsistent statement of instruction. It kind of depends on how you read the record. I mean, first of all, Haas says you should give a limiting instruction. The judge should have just given a limiting instruction every time you have this kind of hearsay. But reading counsel's colloquy, they're saying, well, are you going to incorporate your ruling in here? And then the judge says, no, it's not really my ruling. I'm not going to put that in. I'm not going to tell the jury about that. So it seems to me that a fair reading of that is they're trying to get the jury to understand that this is not substantive evidence. Right. So I kind of read it maybe as a request for some kind of explanation or limitation to the jury, so it wasn't waived. Would you agree with that? Well. It might not have been the clearest. All right. Okay, Your Honor. The governor did not argue her point as being a substantive evidence of her involvement. It was simply impeachment. And that was the same argument we made in the prior inconsistent statements of Mr. Pajano. Pajano, if I can jump to that. Pajano testified as a defense witness. They were boyfriend-girlfriend. They were lovers. It was clear they had a romantic relationship for a long time. She testified she wanted to marry Mr. Pajano, that they had stayed together in her residence, et cetera, et cetera. He had tried to plead guilty without encompassing her evidence in his plea on count eight. In fact, he first pled to counts one, three, and seven, and then a week later came back and said, I want to plead the count eight, but we're not having a bedding night. It's got nothing to do with Vanessa Perut, et cetera, et cetera. And he had said, they called him as a witness. Perut called Pajano as a witness, and he testified that she wasn't involved with this. I hid this from her. I didn't tell her anything was going on at night. I didn't have her in a towel bag. She didn't know anything about this. And simply to ask, didn't she talk about this? I didn't talk on the ride from Bonner-McClohe to the Club Roxa where the car was. We didn't talk. I didn't tell her anything was going on, et cetera, et cetera. Well, sir, didn't she meet with two DEA agents in October and November in the presence of your counsel, Gerald Wilson, at the Federal Detention Center? Yes, I did. Didn't you tell them at that point, the agents, that you did tell Blatt that you were going to go pick up the load? Yes, I did. So you didn't then have need to bring in the agents once they admitted? Correct, Your Honor. We never called the DEA agents to testify that he, in fact, said those things. Okay. Was there an instruction given that that was for impeachment purposes only with respect to those statements? I don't believe there was, Your Honor, at that case. And, of course, it was not argued by the government that it was a direct knowledge that she was a liar by this prior inconsistent statement of Pajaro. We argued that she knew, based upon their being together all the time, the stuff was being in her safe, that she did not react when the stuff was taken out of her safe by the police officer, Lieutenant Rosalyn Chenko. She was not surprised, indicating she knew it was there. Plus, she had made an incriminating statement in the marshal's vein on the way to the courtroom one day. Mr. Gutierrez testified that, I told you to get that S out of the house. And don't worry about it, he said something like, don't worry about it, just tell me what happened. He said, I told you to get that S out of the house. So your position would be, even if there was some error in not giving a limiting instruction, that in the end you didn't focus on it and there's sufficient other evidence? There's sufficient other evidence looking at this, taking this aside, that this would be harmless if it was. Clearly, the facts was well high on these issues. There was a motion in limine I had made to prevent Mr. Pajaro, and that goes to the consistent statement of Mr. Pajaro. They wanted to bring in his prior consistent statement. He got on the stand and said, she didn't know anything. And we said, well, didn't you tell the agents that she did know those things? Then he came up and said, well, why don't I bring out his statement at the time of the arrest where he said, she's not involved. And Classic 803, I have a number wrong here, but Classic, we did not impeach him, saying retro fabrication or improper motive. And that's what you have to have to bring in that prior consistent statement. And we filed a motion in limine based upon Osterbrenner, trial counsel for Ms. Broad, that, look, you can't, he made those statements in his opening statement, that the higher I was going to get on it, I'll say from Daryl Engel, he said, she didn't have any knowledge. And we said, stop. We filed a motion in limine, had that healed outside the presence of the jury, of course, and Judge Mulway said, well, Mr. Brown, do you think Mr. Millich's position has merits? And he goes, well, yes, it does, you know, et cetera, et cetera. Unless the court has questions for me on this. What about the boyfriend, I mean, not the boyfriend, the husband? I was a little perplexed about using the husband's drug trial as evidence that she knew about his boyfriend's drugs. First of all, from day one, they tried to present, they, Ms. Baruch's attorney, tried to present Ms. Baruch as naïve, gullible, not knowing what's going on, totally in the dark, and that's where she did testify. And Judge Mulway continues to warn the defendant, if you continue to go into this situation, you get up to the point where Mr. Millich may be able to get into this situation where you were up there, sat on a trial in California, in Fresno, before Judge Wagner, I think, Wagman, I think it is, and watched the trial, heard the trial, heard the verdict, et cetera. Well, we didn't go into that, of course. What they did do was testify that she was in the dark. She testified she was in the dark. She testified she never saw drug paraphernalia. She testified she didn't have any suspicions of this, that she thought there was a lot of girls involved. She thought that when the car was firing at the ROCSO, when they went to the ROCSO, that there was a girl involved. It's a strip club in Kayamoku Street, so she thought it was a, he had a girlfriend, and she was upset because of that rather than any inkling of drug suspicion. And additionally, the court found that the door had been opened in that regard. It was relevant to her state of mind and what was going on that night. It was certainly relevant because Pajaro had testified that they didn't talk in the car, and at the DEA debriefing at the Federal Detention Center, he admitted to her testimony at the DEA debriefing, Your Honor, that she had told him, hey, be careful, remember what happened to my boyfriend, or my husband, Edwin, and continued to talk about Edwin's problems that night in the car. And that only came out after they both denied, well, it came out with him when he denied having any conversations and that she was not involved and she didn't know what was going on. It came out then. And then it only, then it came out in a limited regard with her when she talked about that, there was evidence that this was the worst day in her life, the day her husband was. . . Went to the trial. Was sentenced, I guess it was, Your Honor. It was in her little notebook. In fact, it was in the defense exhibit that this notebook came out of. Let me ask you on the sentence, does the government oppose a limited remand along the lines that we've been doing, which is asking the district court, would you have done the same thing, yes or no? I think the way the Ninth Circuit is, your court is going, Your Honor, a remand is necessary in every case. I wanted to ask you another question. Yes, sir. I get the impression, I haven't read the whole record, obviously, that her conduct was more passive, that her boyfriend was doing everything, and maybe that her drugs were transported in her truck. I'm having a little difficulty with the evidence, particularly whether it was enough substantial to justify the conviction, and particularly since the same evidence was offered on the conspiracy and the jury found her not killing. I realize inconsistent verdicts don't mean a lot, but it does trench on whether there was really enough evidence to sustain this conviction. Well, I think … It's pretty thin, but maybe you'd like to just say a word on it. Well, just a word on it, Your Honor. In the light most favorable to the United States, she provided a place to store the drugs, her safe. It was her safe. Her offense, of course, not only … Was she living there? Was her boyfriend living off the island? She had stayed on the island, if there was that testimony. So you had a safe, go ahead. Yes, it was a safe. There was a gun on the safe. Of course, there was also drugs at his place of business and in his car, which is out on Sand Island, 20 miles away, another portion of drugs and a gun there also. But he used her car to transport the drugs for a pickup spot. He had actually taken … The courier came in, got off the plane, met with Mr. Pajaro at the nightclub, Roxa. They simply switched cars. Actually, Mr. Pajaro got in the courier's cab, took the cab to the Kalihi Bar, where the defendant was, then carried a knapsack back with Mr. Yoshihara, I think it was, gave him a ride back. Their drinking partner at the Kalihi Bar gave him a ride back to Roxa, where the defendant's truck was, that Ford Ranger truck, and they drove from there. So she used her truck to transport the drugs out of the downtown area into the country, Waipahu, where they were safeguarded. And some were stored. Not all of it, but about two pounds of it was stored. In the light most favorable to the United States, we submit that we have. And, in general, inconsistent verdicts? Who knows? I don't know. If I've answered your questions, I still have a few more minutes, but … Well, maybe you want to talk about Mr. Pajaro's … Essentially, as I hear him, although he'd like us to decide about the coercion, which we may or may not do, he basically wants a remand. Well, the judge decided it based upon the guidance. That's right. How do you get around a remand with the way I've read the decisions of this court? There are two different kinds of remands. Well, a limited remand is what I suggest. If, in fact, we determine the judge applied the guidelines incorrectly, that could open the door to a vacating of the sentence and a straight resentencing. I don't. I submit to the court Judge Mulway did not apply the guidelines incorrectly. I submit that the defendant admitted a drug amount. Admitted also a drug amount, if you look at the transcript. Let me ask you about the drug amount, because there's this sort of argument. The more than 50 grams was admitted, but then in terms of specific amounts … I read … I'm sorry. Was there any finding? I read into the record the lab reports as part of the factual basis, and he agreed with it on both cases. I read into the first change of plea where he pled guilty to counts one, three, and seven, the conspiracy, the telephone count, and the stuff in his garage car out in Sand Island, four pounds. I read the lab report. I admitted, or I read a little bit of it as a fact, that it was seven pounds that came in from Thorough Enclosed Courier, Mr. Patrick Giles, and then it played flip-flop with the defendant. The defendant got in Giles' taxi and took the drugs off. So your position would be there wouldn't be any need for further fact-finding because of the admission? Not fact-finding. Yes, just limited remand. Okay. To see if her decision would be materially different if she had known the guidelines weren't required. Okay. Well, why don't we have rebuttal, and I think your position is clear. Thank you, Your Honor. You've used up your time, but I'm going to give you a minute, and I'm going to give your co-counsel a minute as well. Appreciate it. As to the drug amount, under Thomas, it clearly states that what you need, or the burden is on the government to get an explicit admission to the facts on which they want a sentence,  our position is that the government gives a long recital, including in the long recital, the lab report amounts, and at the end of the long recital, again, the judge says, okay, anything you disagree with, Mr. Fajardo, we'll know that that is an explicit admission. It's more of an acquiescence to the recital, but not. So you would want the government to stop after every sentence? Well, the judge would specifically have a colloquy as to the elements of the offense, in this case, the drug amounts. That is what Thomas requires. So let's just play your theory out if that's required. So now they go back and the government brings the same lab reports back, and even if there's not an admission, the district court could make a finding, correct? Yes. In this case. Could there be any basis for any finding different than the amounts in the lab report? Well, what Mr. Fajardo did say, I'm going to change it, please, after questioning by the court was when the court asked, do you agree or not, he said, I agree with the recital, except I don't know the rates. So he did explicitly say that he didn't know the amount of the drugs. So you think the evidence at that point will be a report here in defense saying, I don't know. It's hard to imagine a different conclusion or finding by the court. Well, this is our position. He went to court for the change of plea, ready to admit to the elements of the offense. So after the colloquy, it would be our position that the court could properly find an admission to 50 grams. Right. But as Judge Clifton says, when if you go back there, then they put in the lab report. And then he said, but I didn't really know the amounts. Then the judge makes a finding based on the only actual evidence before her. Boom, boom, boom. These are the amounts. So you're right back where we started. I mean, would you comment on that? Isn't that right where we're going to end up? Well, this is how I would respond. He does try and raise points to the defendant. This is how many pounds I had. I had four pounds in this situation, two pounds in that situation. So I was admitted to the weight, but not the purity. So we believe that after the colloquy again, the proper finding would be 50 grams, regardless of what the government asserts as to the purity or as to the lab reports. You mean, in other words, you think the district court couldn't make a finding based on the lab report and that she would make a finding because your client says, I don't know the purity? Our position would be that we don't think that the court could make a finding that has knowledge based on the lab reports. Okay. I think we have your argument in mind. Thank you. Thank you. In response to the ground on the subject of the evidence used for impeachment. You have a minute on the clock, please. Thank you. Statements and Vanessa's state post-paragraph interview. I don't think that the government's argument dictates whether a instruction, cautionary instruction should have been given that they did not argue it was substantive. That doesn't tell us what the jury was thinking or what it based its verdict on. They really should have been instructed if that statement came in, if those statements came in, what purpose they should be used for. In terms of Pajaro, if Pajaro had read about requirement of recent fabrication or improper purpose before we could have used our consistent statement, the record does show that Pajaro claims he was coached into saying certain things. And I would think that his prior consistent statement is material to show whether he was or was not. Thank you. Thank you. The case of United States v. Pajaro and Baruch is submitted.
judges: Bright, McKeown, Clifton